UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
3M Company,

                        Plaintiff,

          -against-

CovCare, Inc. and Wooter Apparel, Inc.,

                    Defendants.
------------------------------------------------------------X

**MEMORANDUM & ORDER**
21-CV-01644 (DG) (JRC)

DIANE GUJARATI, United States District Judge:

On March 26, 2021, Plaintiff 3M Company ("3M") filed this action against Defendants

CovCare, Inc. and Wooter Apparel, Inc. (collectively, "Defendants"), alleging trademark

counterfeiting in violation of the Lanham Act, 15 U.S.C. §§ 1114(1), 1116(a); trademark

infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); unfair competition,

false endorsement, false association, and false designation of origin under Section 43(a)(1)(A) of

the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); trademark dilution under Section 43(c) of the

Lanham Act, 15 U.S.C. § 1125(c); false advertising under Section 43(a)(1)(B) of the Lanham

Act, 15 U.S.C. § 1125(a)(1)(B); trademark infringement under New York common law; false

advertising under New York General Business Law § 350; unfair competition and passing off

under New York common law; and dilution and injury to business reputation under New York

General Business Law § 360-l.  Complaint ¶¶ 85-172, ECF No. 1.

On March 31, 2021, 3M filed an Emergency Motion for Temporary Restraining Order

and Preliminary Injunctive Relief (the "Motion"), ECF No. 8, pursuant to Rule 65 of the Federal

Rules of Civil Procedure ("Rule 65"), the Lanham Act, 15 U.S.C. § 1116(a), the New York

Consolidated Laws, and New York common law, together with supporting documents, including

Declarations of Christine L. McCool, Ph.D. ("First McCool Decl."), ECF No. 8-2, and Kara M.

1

Mundy ("First Mundy Decl."), ECF No. 8-20.[1]  Defendants responded by Memorandum of Law

in Opposition filed on April 5, 2021 ("Defs.' First Br."), ECF No. 14, together with Declarations

of Aaron Arroyo ("First Arroyo Decl."), ECF No. 15, Alex Kagan ("First Kagan Decl."), ECF

No. 16, and Robert Garson ("First Garson Decl."), ECF No. 17.

On April 5, 2021, the Court held a conference on the Motion.  ECF No. 18.  On April 6,

2021, the parties submitted additional briefing, together with supporting documents.  3M

submitted a supplemental brief ("3M's Second Br."), ECF No. 22, an additional Declaration of

Kara M. Mundy ("Second Mundy Decl."), ECF No. 22-1, and a Declaration of Cassie Jacobson

("Jacobson Decl."), ECF No. 22-2.  Defendants submitted a supplemental Memorandum of Law

("Defs.' Second Br."), ECF No. 21, and supporting documents, including additional Declarations

of Alex Kagan ("Second Kagan Decl."), ECF No. 19, and Aaron Arroyo ("Second Arroyo

Decl."), ECF No. 20.  In its supplemental brief, 3M, *inter alia*, described the relief sought.

Specifically, 3M "request[ed] that this Court grant an order restraining and enjoining Defendants

from:

- Selling or offering for sale any 3M-brand N95 respirator products;

- using the 3M Marks in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any purported 3M-brand N95 respirator products;

- falsely representing themselves as being a distributor, authorized retailer, and/or licensee of 3M and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection to 3M and its products; and

- offering to sell any of 3M's products at a price and/or in a manner that would constitute a violation of New York General Business Law [§] 369-R."

---

[1]  On April 1, 2021, the Court ordered 3M to either provide notice of the Motion to Defendants or, pursuant to Rule 65(b)(1)(B), certify in writing any efforts made to give notice to Defendants and the reasons why notice should not be required.  By certificate of service filed April 2, 2021, 3M indicated that it provided notice to Defendants on April 1, 2021.  *See* ECF No. 9.

3M's Second Br. at 20-21; *see also id.* at 17.

By order dated April 7, 2021, the Court, based on the record before it at that time, issued a temporary restraining order ("TRO") in accordance with the terms set forth above; reserved decision on 3M's Motion insofar as it sought a preliminary injunction; and set a briefing schedule and date for argument on the requested preliminary injunction. *See* ECF No. 24.[2]

The parties thereafter submitted further briefing, together with additional supporting documents. On April 14, 2021, Defendants submitted a Memorandum of Law in Opposition to 3M's Motion for Preliminary Injunctive Relief ("Defs.' Third Br."), ECF No. 26, together with an additional Declaration of Alex Kagan ("Third Kagan Decl."), ECF No. 25. On April 19, 2021, 3M filed a Reply in Support of its Motion ("3M's Third Br."), ECF No. 29, together with an additional Declaration of Christine L. McCool, Ph.D. ("Second McCool Decl."), ECF No. 29-1. In response, Defendants, on April 19, 2021, filed a letter requesting to correct the record with respect to a factual issue raised in 3M's briefing. ECF No. 31.

The Court held argument on 3M's Motion insofar as it sought a preliminary injunction on April 21, 2021, after which the Court directed the parties to submit supplemental briefing on certain limited issues raised at argument and extended the duration of the TRO until the Court ruled on the preliminary injunction request. *See* ECF No. 33.

In keeping with the Court's April 21, 2021 order, the parties submitted additional briefing on April 23, 2021. 3M submitted another supplemental brief ("3M's Fourth Br."), ECF No. 34, and Defendants submitted a Further Evidentiary Brief in Opposition to 3M's Motion ("Defs.'

---

[2] In issuing the TRO, the Court did not require 3M to post a bond. *See* ECF No. 24 at 5.

Fourth Br."), ECF No. 35, together with additional Declarations of Aaron Arroyo ("Third Arroyo Decl."), ECF No. 36, and Robert Garson ("Second Garson Decl."), ECF No. 37.

Having heard from the parties at both the April 5, 2021 conference and the April 21, 2021 argument and having considered all of the above filings and supporting documents, including the sworn declarations, as well as the record and proceedings to date, including the Complaint, the Court grants in part and denies in part 3M's request for a preliminary injunction for the reasons set forth below.

Additionally, the Court denies without prejudice to renewal before the appropriate Magistrate Judge Defendants' requests that this Court unseal case 21-MJ-00465 (E.D.N.Y.) and order that certain seized goods that were previously in Defendants' possession "be preserved until further order of this Court." *See* Defs.' Fourth Br. at 7.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the supporting declarations and other evidence submitted in connection with the instant Motion and are undisputed, unless otherwise noted.[3] Citations to the parties' supporting declarations incorporate by reference the documents cited therein.

3M is a leading manufacturer of N95 respirators (hereinafter, "masks") and has sold N95 masks in the United States under the 3M brand name for decades.  First McCool Decl. ¶ 4.  Since the beginning of the COVID-19 pandemic, the public has become familiar with 3M as a

---

[3]  The facts upon which the Court's analysis herein relies are undisputed in that they are either conceded or not contradicted by record evidence.

manufacturer of N95 masks and other equipment essential to protecting healthcare personnel and workers from exposure to airborne particles, including viruses like COVID-19.  *Id.* ¶ 6.

3M has invested hundreds of millions of dollars in advertising, promoting, offering for sale, and selling its vast array of goods and services under its standard-character mark "3M" and 3M design mark (together, the "3M Marks").  *Id.* ¶ 7.  3M has obtained numerous federal trademark registrations in connection with the 3M Marks and 3M's associated logo.  *Id.* ¶¶ 8-14.

3M has established a system by which the public can, either via telephone or via 3M's website, report suspected fraud, including the sale of potentially counterfeit 3M-branded products (3M's "Fraud Hotline").  *See* Jacobson Decl. ¶¶ 2, 4; *see also* Motion at 7.  3M periodically publishes "counterfeit alerts" aimed at raising awareness of potentially counterfeit products being sold under particular "lot codes."  *See* First Kagan Decl. ¶¶ 4-5; *see also* ECF No. 16-1 (3M "Counterfeit Alert" listing certain lot codes determined to be associated with counterfeit products).

When 3M receives a report concerning a 3M-branded mask, 3M confirms if the flagged mask is "authentic or counterfeit based on lot number and visual inspection."  Jacobson Decl. ¶ 5.  3M at least sometimes works with United States Customs and Border Protection ("CBP") "to inspect certain sellers of goods for counterfeit items" based on reports submitted to the 3M Fraud Hotline.  *See* Third Kagan Decl. ¶ 7; *see also* First McCool Decl. ¶ 26 (describing 3M's coordination with "federal agents" in conducting an inspection of products located in Defendants' warehouse in Monroe Township, New Jersey).  If 3M determines that a reported product is counterfeit, 3M informs the reporting purchaser that the masks in the purchaser's possession are counterfeit and do not come with 3M's efficacy guarantees.  Jacobson Decl. ¶ 6.

Defendant CovCare, Inc. was established in 2020 to supply personal protective equipment ("PPE"), including masks, to hospitals, first responders, companies, and government agencies.  Third Kagan Decl. ¶¶ 3-4.  In conducting its business, CovCare uses the "logistical and manufacturing experience" of its corporate affiliate Defendant Wooter Apparel, Inc.  *Id.* ¶ 3.

In September 2020, the "CovCare Team" sent to a customer an email in which CovCare announced that "we now carry three models of 3M NIOSH N95 masks," acknowledging in the same email that "3M's production lines have been filled to capacity" and that "many counterfeit masks have saturated the market as a result."  ECF No. 8-9 (email sent by the "Covcare Team" to a customer) at 1; *see also* First McCool Decl. ¶ 15.

3M alleges that it received "multiple reports of Defendants' sale of suspected counterfeit respirators to healthcare professionals and the general public, and price gouging."  Motion at 11.[4] As a result, on December 1, 2020, 3M sent a cease-and-desist letter to Alex Aleksandrovski, whom 3M claims to be CovCare's founder and CEO.  *See* First McCool Decl. ¶ 17; ECF No. 8-11 (copy of the December 1, 2020 cease-and-desist letter); Motion at 11.  In that letter, 3M informed Mr. Aleksandrovski that 3M had concluded that CovCare was, *inter alia*, "falsely representing itself as an authorized distributor of 3M."  ECF No. 8-11 at 1.  Defendants responded to the cease-and-desist letter on December 15, 2020, asserting that CovCare "ha[d] never claimed to be an authorized 3M distributor."  ECF No. 8-12 at 1 (email from "Katherine Grimmie from Covcare" to 3M's "Covid Enforcement" email account); *see also* First McCool Decl. ¶ 18.

---

[4]  In their many submissions, the parties refer to "Defendants" without distinguishing between CovCare and Wooter Apparel.  Defendants do not contest these collective references or otherwise indicate that CovCare and Wooter Apparel played separate roles in the relevant factual history.  Accordingly, in keeping with the parties' submissions, the Court generally refers to Defendants collectively.

After this exchange, 3M continued to receive reports via its Fraud Hotline from purchasers of CovCare masks purporting to be 3M-branded N95 masks.  *See* First McCool Decl. ¶¶ 20-24; *see also* ECF No. 8-14 (images of purported 3M masks and associated packaging, together with receipts bearing the CovCare name, submitted via 3M's Fraud Hotline); ECF No. 8-15 (images of 3M-branded masks submitted to the Fraud Hotline); ECF No. 8-16 (images of masks, packaging, and receipts submitted to the Fraud Hotline); ECF No. 8-17 (images of masks and receipts submitted to the Fraud Hotline); Motion at 13-14 (alleging that these four reports were submitted in 2021 on February 2, 5, 8, and 9, respectively).  With respect to each of these reports, 3M, "[b]ased on identified concerns and upon inspection of photographs of the products and packaging included in the hotline report[s], . . . determined that the products Defendants sold to th[ese] purchaser[s] were counterfeit masks purporting to be 3M N95 respirators."  First McCool Decl. ¶¶ 20-23.

On February 14, 2021, Defendants sent to 3M a further response to the December 1, 2020 cease-and-desist letter, in which Defendants acknowledged that they were in receipt of a "Product Recall and Counterfeit Notice . . . concerning Model 1860 [a model of N95] masks." ECF No. 8-21 (letter from Robert Garson to 3M's Office of General Counsel) at 1; *see also* First Mundy Decl. ¶ 2.  In the same letter, Defendants raised the possibility that they "ha[d] been the victim of an elaborate fraud" and claimed that they would not sell or deal with any Model 1860 masks until they "[could] establish, with certainty, whether this [wa]s the case."  ECF No. 8-21 at 1; *see also* First Mundy Decl. ¶ 2.

3M alleges that Defendants nevertheless continued to sell 3M-branded Model 1860 masks, including selling approximately 60,000 masks to a New York-based broker who, in turn, sold the masks to Ottawa Hospital in Ottawa, Ontario, Canada.  *See* Motion at 15.  3M obtained

physical samples of the masks sold to Ottawa Hospital, inspected them, and, based on the inspection, confirmed that the masks were counterfeit 3M-branded masks.  *See* First McCool Decl. ¶ 25.  This inspection at least involved comparing the printing on the masks to that present on authentic 3M masks and examining the "construction of the products" in comparison "to the known characteristics of authentic 3M [masks]."  *See* ECF No. 8-19 (copy of letter sent by 3M's Personal Safety Division to the Interim Director of Ottawa Hospital's Supply Chain Operations) at 1; First McCool Decl. ¶ 25.

It appears that, by this point, federal law enforcement had become involved.  On approximately February 17, 2021, CBP visited Defendants' office in Staten Island, New York, "because some of the 3M products ordered by Defendants were flagged at the airport as being counterfeit goods."  First Arroyo Decl. ¶ 3.  "Since it was unclear which of the 3M goods were counterfeit, CBP advised Defendants to recall all 3M products and issue refunds."  *Id.*

On February 18, 2021, 3M sent to Defendants' counsel a second cease-and-desist letter.  First Mundy Decl. ¶ 3; ECF No. 8-22 (copy of the February 18, 2021 cease-and-desist letter).  In this second letter, 3M informed Defendants of its determination that CovCare had sold certain purported 3M-branded masks that were, in fact, counterfeit.  *See* ECF No. 8-22 at 1.  In the same letter, 3M explained that it identifies counterfeit masks by examining the printing on the masks, the construction of the masks, and the packaging associated with the masks.  *Id.* at 1-2.  3M requested that Defendants cease and desist all sales or offers to sell any 3M-branded products, and that Defendants contact 3M to confirm that Defendants would not "return or destroy any 3M-branded products in [CovCare's] possession, custody, or control."  *Id.* at 3.

After a series of phone calls between counsel for the parties, Defendants, on February 25, 2021, sent to 3M a letter in response to the second cease-and-desist letter, in which Defendants

continued to assert that they were not selling counterfeit masks.  *See* First Mundy Decl. ¶ 4; *see also* ECF No. 8-23 (Defendants' February 25, 2021 letter in response to February 18, 2021 cease-and-desist letter) at 2.  In the February 25, 2021 letter, Defendants acknowledged that they had been engaged with several federal enforcement agencies, including the Federal Bureau of Investigation, the Food and Drug Administration, the Department of Homeland Security ("DHS"), and CBP.  ECF No. 8-23 at 1.  Defendants explained that officials from these agencies had visited their facility, where "[n]o allegedly counterfeit items were found."  *Id.*  Defendants further explained that an agent believed to be from DHS had instructed them to issue exchanges or refunds to customers who had received "masks that fall within the complained of model numbers."  *Id.* at 1-2.

3M alleges that federal agents visited Defendants' facilities a second time on March 16, 2021, where they observed a pallet and several cases of purported 3M-branded masks.  *See* Motion at 18.  Defendants have submitted a declaration in which CovCare's Chief Marketing Officer, Alex Kagan, seems to reference this second visit, explaining that "on the second occasion when CBP attended CovCare's Staten Island location," the agents observed products that were "locally sourced goods and . . . [were] returns made at the direction of CBP to be transferred to [a separate] location."  *See* Second Kagan Decl. ¶¶ 4-5.

On March 24, 2021, federal agents visited Defendants' warehouse in Monroe Township, New Jersey.  First Arroyo Decl. ¶ 5; *see* First McCool Decl. ¶ 26.  There, the agents "went through samples of the inventory Defendants were holding in the warehouse."  First McCool Decl. ¶ 26.  The agents were joined by two 3M representatives present via videoconference, one of whom was Christine L. McCool, Ph.D., a "Research Specialist" employed by 3M.  *Id.* ¶¶ 2,

26; First Arroyo Decl. ¶ 5.  "Representatives of the Defendants were present for this process." First McCool Decl. ¶ 26; *see also* First Arroyo Decl. ¶ 5.

3M keeps the methods and processes it uses to distinguish between counterfeit and authentic masks "highly confidential."  *See* Second McCool Decl. ¶¶ 4-5.  Accordingly, 3M has not specified exactly how it conducted the "visual inspection" of the products present in Defendants' warehouse.  *See id.* ¶ 12.  However, the inspection involved, at minimum, "viewing photos of the products and their packaging from many different angles via video conference." First Arroyo Decl. ¶ 7; *see also* First McCool Decl. ¶ 26 (describing the "visual inspection" in which the 3M representatives and federal agents "went through samples of [Defendants'] inventory").

Based on this inspection, 3M determined that Defendants were in possession of some counterfeit masks.  *See* First McCool Decl. ¶ 26; *see* Second McCool Decl. ¶ 12 ("I personally conducted a review and analysis of masks located at Defendants' warehouse in Monroe Township, New Jersey on March 24, 2021.  I personally, as an agent and employee of 3M, determined that masks located at Defendants' warehouse were counterfeit."); *see also* First Arroyo Decl. ¶ 8 (explaining that the 3M representatives "determined that Defendants were in possession of some *illegitimate* masks" (emphasis added)).  Approximately 84,000 masks were deemed counterfeit – or, according to Defendants, "illegitimate" – and marked with red tape by CBP.  *See* Second Arroyo Decl. ¶ 4.  Approximately 2,400 masks were not marked with red tape. *See id.* ¶ 5.  Defendants have characterized these 2,400 masks differently throughout their submissions, sometimes contending that they were deemed "legitimate" by 3M representatives, *see, e.g.*, First Arroyo Decl. ¶ 7, and sometimes contending that these 2,400 masks simply "were not deemed to be counterfeit," *see, e.g.*, Defs.' Third Br. at 4.

Following the March 24, 2021 inspection, Defendants informed CBP that they were in possession of an additional 30,507 masks stored at their Staten Island warehouse, resulting largely from returns, some of which shared lot codes with the masks that 3M deemed counterfeit. *See* Second Arroyo Decl. ¶¶ 4, 7.

On April 19, 2021, CBP again visited Defendants' New Jersey warehouse and seized "491 boxes" of previously identified 3M products, "which Customs and Border Protection with 3M over video had previously flagged as suspicious on March 24, 2021." Third Arroyo Decl. ¶ 4; *see also* Defs.' Fourth Br. at 2. Defendants assert that they remain in possession of "467 boxes of various 3M products that have not been flagged as suspicious by Customs and Border Protection." Third Arroyo Decl. ¶ 5.

Although the parties have centered their submissions and arguments on Defendants' sale of 3M-branded masks, 3M alleges that Defendants engaged in misconduct beyond just selling counterfeit masks. For example, 3M claims that CovCare supplied falsified documents to a customer who was questioning the authenticity of CovCare's 3M-branded masks. *See* Motion at 11-12; *see also* First McCool Decl. ¶ 19. The documents included an allegedly falsified "3M acknowledgement agreement" stating that CovCare "is an authorized agent to procure product for the company." ECF No. 8-13 (copy of allegedly falsified acknowledgement agreement) at 5. Certain of the documents, including the acknowledgement agreement, were signed by two individuals who were at the relevant time not employees of, or otherwise affiliated with, 3M. *See id.*; First McCool Decl. ¶ 19.

3M makes similar allegations with respect to the Ottawa Hospital sale, *see* Motion at 15, and has submitted a document reflecting that an individual with a CovCare email address messaged an account that, according to 3M, belongs to the broker involved in the Ottawa

Hospital sale.  *See* ECF No. 8-18 (copy of the email) at 1; *see also* First McCool Decl. ¶ 24.

Therein, the CovCare employee assured the recipient that certain masks (presumably those sold

to Ottawa Hospital) were "purchased off a distributor of 3m Vietnam and the 1860S was made in

3m Singapore."  ECF No. 8-18 at 1.  The CovCare employee also told the recipient that "we are

a trusted and reliable Distributor."  *Id.* at 1.

3M also alleges that Defendants have used proprietary images of 3M's masks on the

CovCare website and misappropriated 3M videos about the different masks that 3M

manufactures.  *See* Motion at 10.

Finally, 3M alleges that Defendants "have also engaged in price-gouging," asserting that

Defendants at one point charged an inflated price of $74.99 for ten masks, "approximately 500%

above 3M's actual listed price."  *Id.* at 20.

## II.    Procedural Background

3M filed its Complaint on March 26, 2021.  ECF No. 1.  On March 31, 2021, 3M filed

the instant Emergency Motion for Temporary Restraining Order and Preliminary Injunctive

Relief.  ECF No. 8.

The Court held a conference on the Motion on April 5, 2021, ECF No. 18, and granted

the Motion in part on April 7, 2021, issuing a TRO with the terms set forth above and reserving

decision on the Motion insofar as it sought a preliminary injunction, *see* ECF No. 24.

On April 21, 2021, the Court heard oral argument on 3M's request for a preliminary

injunction.  ECF No. 33.

## DISCUSSION

**I.    Preliminary Injunction Analysis**

**A.    Applicable Law**

"A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success

on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground

for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a

likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of

hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by

the issuance of an injunction."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d

Cir. 2015) (alteration in original) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir.

2010)).  The party seeking injunctive relief "need only show a likelihood of success on the merits

of at least one of [its] claims."  *Home It, Inc. v. Wen*, No. 19-CV-07070, 2020 WL 353098, at *5

(E.D.N.Y. Jan. 21, 2020) (quotation marks omitted).

"Irreparable harm exists in a trademark case when the party seeking the injunction shows

that it will lose control over the reputation of its trademark . . . because loss of control over one's

reputation is neither calculable nor precisely compensable."  *Juicy Couture, Inc. v. Bella Int'l

Ltd.*, 930 F. Supp. 2d 489, 503 (S.D.N.Y. 2013) (alteration in original) (quoting *U.S. Polo Ass'n,

Inc. v. PRL USA Holdings Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011)); *see also U.S. Polo

Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013) (recognizing that

ceding "control over . . . reputation and goodwill" can constitute irreparable harm in the

trademark context); *see also New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.

Supp. 2d 305, 343 (S.D.N.Y. 2010) ("Prospective loss of . . . goodwill alone is sufficient to

support a finding of irreparable harm." (citing *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995))).

Preliminary injunctions are "prohibitory" or "mandatory."  *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018).  "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it."  *Id.* (citing *Tom Doherty Assocs.*, 60 F.3d at 34).  Because mandatory injunctions disrupt the status quo, a party seeking a mandatory injunction must meet a heightened legal standard by "mak[ing] a strong showing of irreparable harm" and "demonstrat[ing] a clear or substantial likelihood of success on the merits."  *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (quotation marks omitted); *see also N. Am. Soccer League*, 883 F.3d at 37.  For purposes of this analysis, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy."  *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)); *see also Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-00181, 2020 WL 915824, *8 (S.D.N.Y. 2020) ("The Second Circuit has repeatedly explained that, for purposes of granting a preliminary injunction, the 'status quo' is not simply the status quo in the moment before relief is granted.  Rather, it refers to 'the last actual, peaceable uncontested status which preceded the pending controversy.'" (quoting *N. Am. Soccer League*, 883 F.3d at 37)).

"On a motion for preliminary injunction, *where essential facts are in dispute*, there must be a hearing . . . and appropriate findings of fact must be made."  *In re Defend H20 v. Town Bd. of the Town of East Hampton*, 147 F. Supp. 3d. 80, 96 (E.D.N.Y. 2015) (alteration in original) (emphasis added) (quoting *Republic of Philippines v. N.Y. Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988)).  "However, '[i]t is not a rigid requirement that oral testimony be taken on a motion for a

preliminary injunction.'" *Id.* (alteration in original) (quoting *Republic of Philippines*, 852 F.2d at 37). "Significantly, '[a]n evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case . . . or when the disputed facts are amenable to complete resolution on a paper record.'" *Id.* (quoting *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998)); *see also Dress for Success Worldwide v. Dress 4 Success*, 589 F. Supp. 2d 351, 357 (S.D.N.Y. 2008) ("[T]here is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." (quoting *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir. 1989))).

### B. 3M is Entitled to a Preliminary Injunction

As an initial matter, the parties dispute whether the requested preliminary injunction is mandatory or prohibitory. *See* Defs.' Third Br. at 7-8; 3M's Third Br. at 2-3. The Court need not resolve this issue because, as set forth below, 3M has presented sufficient evidence to warrant a preliminary injunction even under the more rigorous mandatory injunction standard. *See Yang v. Kellner*, 458 F. Supp. 3d 199, 209 (S.D.N.Y.) (declining to decide whether requested injunction was prohibitory or mandatory where more rigorous standard met), *aff'd sub nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).

### i. 3M Has Shown a Clear and Substantial Likelihood of Success on the Merits

3M alleges, *inter alia*, claims of trademark counterfeiting; trademark infringement; and unfair competition, false endorsement, false association, and false designation of origin[5] under the Lanham Act, 15 U.S.C. §§ 1114(1), 1116(a), and 1125(a)(1)(A).  *See* Compl. ¶¶ 85-124.

Section 32(1) of the Lanham Act prohibits "the use in commerce of 'any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.'"  *Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 486 (S.D.N.Y. 2008) (quoting 15 U.S.C. § 1114(1)); *see also Johnson & Johnson Consumer Cos., Inc. v. Aini*, 540 F. Supp. 2d 374, 383 (E.D.N.Y. 2008).  "A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.  Similarly, Section 43(a) of the Lanham Act imposes civil liability on "[a]ny person who, on or in connection with any goods . . . uses in commerce any word, term, name, [or] symbol . . . or any . . . false or misleading description of fact, or false or misleading representation of fact, which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of his or her goods . . . by another person." 15 U.S.C. § 1125(a)(1).  "Under both provisions, the registrant need not prove intent in order to succeed on the issue of liability and procure injunctive relief."  *Johnson & Johnson Consumer Cos.*, 540 F. Supp. 2d at 384.

---

[5] For the sake of brevity, the Court hereinafter refers to 3M's claim of unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1) simply as a claim of "unfair competition."

Courts in this Circuit analyze trademark infringement claims under a two-step test that asks "first whether the mark 'merits protection' and, second, whether the allegedly infringing use of the mark (or a similar mark) is 'likely to cause consumer confusion.'" *Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44, 47 (2d Cir. 2017) (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224 (2d Cir. 2012)); *see also Opal Fin. Grp., Inc. v. Opalesque, Ltd.*, 634 F. App'x 26, 27 (2d Cir. 2015).  In addition, a plaintiff must show that the defendant used its mark in commerce.  *See* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1).  To determine whether there is a likelihood of confusion, courts generally rely on the eight-factor test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).[6]

"However, 'where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing.'" *Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 437 (S.D.N.Y. 2020) (quoting *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018)); *see also Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 454-55 (S.D.N.Y. 2005).  In such cases, "[t]he court need only determine the more fundamental question of whether there are items to be confused in the first place – that is, whether the items at issue are, in fact, counterfeit and whether defendants sold those items . . . or offered those items for sale." *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 383 (S.D.N.Y. 2010) (alterations accepted) (quotation marks omitted) (citation omitted); *see also Chanel*, 449 F. Supp. 3d at 437;

---

[6] The eight "*Polaroid* factors" are: "(1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009).

*Spin Master*, 325 F. Supp. 3d at 422 ("The sale of counterfeit goods is sufficient use to establish liability.").

Here, the record contains undisputed evidence that 3M has obtained numerous federal trademark registrations in connection with the 3M Marks.  *See* First McCool Decl. ¶¶ 8-14.  Specifically, 3M has obtained registrations in connection with its standard-character mark, *see id.* ¶¶ 8-10; ECF No. 8-3 ("'329 Registration"); in connection with the 3M logo as it is used, *inter alia*, for "a full line of surgical masks, face shields, and respiratory masks for medical purposes," *see* First McCool Decl. ¶¶ 8, 11-12; ECF No. 8-5 ("'036 Registration"); and in connection with the 3M design mark, *see* First McCool Decl. ¶¶ 8, 13-14; ECF No. 8-7 ("'534 Registration").  Each of these registrations constitutes "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce."  15 U.S.C. § 1115(a); *see also Christian Louboutin*, 696 F.3d at 224-25.  Indeed, another decision in this Circuit found in a different action that 3M was likely to establish the validity and protection of two of the 3M Marks at issue in this case – those subject to the '329 and '534 Registrations.  *See 3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 193 (S.D.N.Y. 2020) (citing 15 U.S.C. § 1115(a), (b)).

In light of the record evidence, the Court finds that 3M has shown a clear and substantial likelihood of establishing the validity and protection of the 3M Marks.  Thus, 3M has shown a clear and substantial likelihood of establishing the first element of its trademark counterfeiting, trademark infringement, and unfair competition claims.

Turning to the second element, the Court finds that 3M has similarly demonstrated a clear and substantial likelihood of establishing that Defendants have used the 3M Marks in a way

likely to cause consumer confusion. As noted above, where counterfeit goods are involved, a plaintiff seeking to demonstrate a likelihood of confusion need only demonstrate that the items at issue are, in fact, counterfeit and that the defendant sold those items or offered them for sale. *See Fendi Adele S.R.L.*, 696 F. Supp. 2d at 383. Thus, whether 3M has demonstrated a likelihood of success on the merits depends on whether the record establishes that Defendants have sold, marketed, or offered for sale counterfeit 3M-branded products. *See Pearson Educ., Inc. v. Labos*, No. 19-CV-00487, 2019 WL 1949820, at *5 (S.D.N.Y. Apr. 23, 2019) (finding that plaintiffs had shown a likelihood of success on the merits of a trademark infringement claim under 15 U.S.C. § 1114(a) where plaintiffs had submitted evidence that defendant sold books bearing counterfeit versions of plaintiffs' marks).

3M has submitted evidence showing that Defendants, at least until recently, were in possession of a significant number of counterfeit 3M-branded masks and that Defendants have, on numerous occasions, sold counterfeit 3M-branded masks to various customers. Specifically, 3M has submitted declarations in which Dr. McCool, one of 3M's "Research Specialists," states under penalty of perjury that she "personally conducted a review and analysis of masks located at Defendants' warehouse . . . [and], as an agent and employee of 3M, determined that masks located at Defendants' warehouse were counterfeit." Second McCool Decl. ¶¶ 2, 12; *see also* First McCool Decl. ¶¶ 2, 26 (explaining that, "[b]ased on 3M's visual inspection of the products at Defendants' warehouse, 3M determined that Defendants were in possession of . . . counterfeit products" and listing the lot codes and model numbers of those products deemed counterfeit).

Defendants' evidentiary submissions do not contradict this evidence – and, arguably, bolster it. In a sworn declaration, Aaron Arroyo, one of Defendants' warehouse managers, states that, after "some of the 3M products ordered by Defendants were flagged at the airport as being

19

counterfeit goods," federal agents, accompanied by two 3M representatives present via videoconference, conducted an inspection of the Defendants' warehouse in Monroe Township, New Jersey, during which "[t]he representatives from 3M . . . determined that Defendants were in possession of some illegitimate masks." First Arroyo Decl. ¶¶ 2-3, 5, 8. Following this inspection, Defendants held these products at their New Jersey warehouse as they "await[ed] further instructions [from federal agents] as to how to properly destroy the *counterfeit* products." *Id.* ¶ 9 (emphasis added).

Defendants' later evidentiary submissions shed light on the number of masks deemed counterfeit. Specifically, Mr. Arroyo, in another of his declarations, states that, as a result of 3M's determination that Defendants were in possession of "illegitimate" products, federal agents marked certain pallets with red tape. Second Arroyo Decl. ¶¶ 3-4. Approximately 84,000 masks were marked as illegitimate, *see id.* ¶ 4, a number that the parties confirmed at argument, *see* Transcript of April 21, 2021 Oral Argument ("Tr.") at 22-23, 34, ECF No. 38. It seems that at least some – and possibly *all* – of these masks have since been seized by CBP. *See* Third Arroyo Decl. ¶¶ 3-4 (explaining that CBP conducted a seizure on April 19, 2021, in which CBP seized from Defendants' New Jersey warehouse 491 boxes that "had previously [been] flagged as suspicious on March 24, 2021"); *see also* Tr. at 34 (counsel for Defendants describing "the masks that are currently being sought or have been seized" as "491 boxes containing 84,446 masks").

The record evidence concerning the March 24, 2021 inspection indicates that Defendants were, at least until recently, in possession of approximately 84,000 counterfeit 3M-branded masks.

Additionally, 3M has offered evidence beyond that concerning the March 24, 2021 inspection that Defendants have marketed, offered for sale, or sold counterfeit 3M-branded masks. Specifically, 3M has submitted evidence that it has received "over 200 reports from CovCare purchasers who were told that they were purchasing from CovCare genuine 3M-brand N95 respirators, only to be told by 3M *in many cases* that upon inspection and verification, the masks they purchased were counterfeit." Jacobson Decl. ¶ 7 (emphasis added). 3M has bolstered this assertion with documentary evidence – namely, four sets of images submitted to 3M's Fraud Hotline in connection with four separate reports. *See* ECF Nos. 8-14, 8-15, 8-16, 8-17. These reports were, according to the declaration of Dr. McCool, each "submitted to 3M's COVID-19 Fraud Hotline by a purchaser of CovCare masks purporting to be 3M N95 respirators." First McCool Decl. ¶¶ 20-23. With respect to each of these four reports, 3M personnel, "[b]ased on identified concerns and upon inspection of photographs of the products and packaging included in the hotline report[s], . . . determined that the products Defendants sold to th[ese] purchaser[s] were counterfeit masks purporting to be 3M N95 respirators." *Id.*

3M has submitted similar evidence with respect to the Ottawa Hospital sale. Dr. McCool states that Ottawa Hospital, through a broker, purchased CovCare masks purporting to be 3M N95 masks. *See id.* ¶ 24. She goes on to assert that 3M acquired physical samples of the masks sold to Ottawa Hospital and, after inspecting those samples, confirmed that the sample masks were counterfeit. *Id.* ¶ 25.

This evidence concerning the masks examined as a result of the Fraud Hotline reports and those examined in connection with the Ottawa Sale indicates that Defendants have sold counterfeit versions of purported 3M-branded masks.

21

*None* of the evidence concerning any of the masks that 3M has deemed counterfeit is, for purposes of the instant analysis, disputed.  That is, the record contains no contrary evidence indicating that the masks that 3M deemed counterfeit were genuine.  Defendants have not, for example, submitted sworn testimony or documentary evidence that the approximately 84,000 masks flagged as counterfeit on March 24, 2021 were legitimate 3M masks.  Nor have they submitted evidence that the other masks previously examined by 3M – those associated with the cited Fraud Hotline reports and the Ottawa Hospital sale – were legitimate 3M masks.[7]

The only evidence that Defendants have offered that *might* be said to go to these masks' legitimacy comes in Mr. Kagan's second declaration.  Therein, Mr. Kagan explains that CovCare routinely requests that its sources engage TÜV Rheinland ("TÜV") to test certain products "presented" to CovCare.  Second Kagan Decl. ¶ 11.  Mr. Kagan goes on to say that TÜV, on several occasions, conducted testing on control samples of 3M masks and their packaging (presumably on behalf of Defendants' suppliers) before issuing test reports concluding that the masks "conformed to the required standards."  *Id.* ¶¶ 12-17.  The problem with this evidence, however, is that it has no bearing on whether the masks that 3M deemed counterfeit were actually legitimate 3M masks; all it shows is that certain masks "presented" to CovCare by its

---

[7]  As discussed further below, Defendants have submitted evidence indicating that they are in possession of "467 boxes of various 3M products that have not been flagged as suspicious by Customs and Border Protection."  *See* Third Arroyo Decl. ¶ 5.  Defendants have also submitted evidence that they are in possession of 2,400 masks that were either deemed "legitimate" by 3M, *see* First Arroyo Decl. ¶ 7, or at least "not marked with red tape," as a result of the March 24, 2021 inspection, *see* Second Arroyo Decl. ¶ 5; *see also* Tr. at 34 (counsel for Defendants describing these 2,400 masks as "deemed by CBP to be legitimate or to not be counterfeit however one wants to couch those words").  The submissions regarding these products do not undercut the evidence relating to the masks that were deemed counterfeit.

sources conformed to some unspecified standards.[8]  Accordingly, the evidence regarding TÜV

does not serve to create a dispute of fact as to the legitimacy of the masks deemed counterfeit.

Beyond the assertions regarding TÜV, Defendants have merely – in their briefing and

without supporting evidence – questioned the strength of *3M's* evidence.  *See* Defs.' Third Br. at

9 ("Plaintiff's Evidence of Counterfeit is *Prima Facie* Insufficient").  Specifically, Defendants

take issue with the methods by which 3M determines whether the masks that it examines are

counterfeit, arguing that 3M's practice of testing masks "wholly through visual inspection by

remote means" is not sufficiently conclusive, in part because 3M has given no "comparators,

standards, codes, or the like, which [could be used] to determine if there is any scientific method

being applied other than . . . subjective, self-serving [conclusions]."  *Id.* at 10-11.  Defendants

argue that Dr. McCool's March 24, 2021 inspection, for example, cannot support a preliminary

injunction because 3M gives no "criteria for how [Dr. McCool's] determination was made, only

that it was made."  *Id.* at 11-12.  Relying on these alleged deficiencies in 3M's inspection

process, Defendants assert, again without supporting evidence, that they "believe the masks to be

legitimate 3M Masks from 3M Singapore."  *Id.* at 12.

These arguments do not create a dispute of fact as to whether the examined masks were

counterfeit.  *See Walpert v. Jaffrey*, 127 F. Supp. 3d 105, 131 (S.D.N.Y. 2015) (noting that

"[a]rguments in a brief do not constitute evidence"); see also *Giannullo v. City of New York*, 322

F.3d 139, 142 (2d Cir. 2003) (noting that a memorandum of law "is not evidence at all").  Here,

the Court considers *Fendi Adele S.R.L.* to be particularly instructive.  696 F. Supp. 2d at 368.  In

that case, Fendi, a fashion designer, brought claims under the Lanham Act against Filene's, the

---

[8]  Defendants acknowledged the limitations of this evidence at argument.  *See* Tr. at 35 (counsel
for Defendants acknowledging that TÜV did not test whether the examined masks "were actual
3M mask[s]" but only whether the masks "met certain industry standards").

corporate owner of a chain of retail stores, for, among other things, selling counterfeit Fendi

products.  *See id.* at 373.  The court ultimately granted summary judgment to Fendi and

permanently enjoined Filene's from selling any item bearing the word "Fendi" or any of Fendi's

trademarks based, in part, on a Fendi employee's examination of 15 Fendi-branded products

obtained from Filene's (the "Examined Items").  *Id.* at 376, 391-92.  In reaching that decision,

the *Fendi Adele S.R.L.* court concluded that "Filene's ha[d] not rebutted Plaintiffs' evidence that

the Examined Items were counterfeit Fendi-branded goods."  *Id.* at 383.  And most relevant here,

the court squarely rejected Filene's assertions that some of the Examined Items were "obtained

on the 'grey market' – *i.e.*, from 'Fendi's manufacturers,' or from 'the warehouse attached to

Fendi's outlet store in Italy' or from 'authorized Fendi retailers.'"  *Id.* at 384 (citations omitted)

(quoting Filene's' briefing).  The court concluded that those arguments amounted to "mere

speculation or conjecture" that could not serve to create an issue of fact concerning the

authenticity of the Examined Items.  *Id.* (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d

Cir. 1995)); *see also Martal Cosms., Ltd. v. Int'l Beauty Exch. Inc.*, No. 01-CV-07595, 2007 WL

895697, *19-20 (E.D.N.Y. Mar. 22, 2007) (adopting report and recommendation rejecting

defendants' argument that they "may" have obtained allegedly counterfeit products from

plaintiff's manufacturers).

  Here, Defendants have offered nothing more than the same sort of mere speculation and

conjecture that the court rejected in *Fendi Adele S.R.L.*  Neither their objections to 3M's

inspection methods nor their (unsubstantiated) theory that the masks at issue *may* have come

from 3M Singapore alters the fact that the record contains no evidence that the flagged masks

were actually genuine.  Meanwhile, 3M has produced evidence – albeit evidence that Defendants

consider weak – that Defendants were in possession of a significant number of counterfeit 3M-

branded masks and, at times, sold counterfeit 3M-branded masks to various customers.[9] Defendants have failed to rebut that evidence.  3M has demonstrated a clear and substantial likelihood of establishing that Defendants have used the 3M Marks in a way likely to cause consumer confusion.[10]

The Court finds that 3M has demonstrated a clear and substantial likelihood that it will prevail on its claims of trademark counterfeiting, trademark infringement, and unfair competition.

3M has met the first requirement for obtaining injunctive relief.

> ## ii.    3M Has Made a Strong Showing of Irreparable Harm

The United States Court of Appeals for the Second Circuit has not yet decided the issue of whether, after the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) – in which the Court held that irreparable harm could not be presumed in the *patent*

---

[9] This defeats Defendants' arguments concerning the first sale doctrine, which provides that, "[a]s a general rule, trademark law does not reach the sale of *genuine* goods bearing a true mark even though the sale is not authorized by the mark owner," *Ergowerx Int'l, LLC v. Maxell Corp. of Am.*, 18 F. Supp. 3d 430, 450 (S.D.N.Y. 2014) (emphasis added) (quoting *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61-62 (2d Cir. 1992)).  Defendants' arguments concerning this doctrine are all premised on the assumption that their masks are, in fact, genuine 3M masks.  *See, e.g.*, Defs.' Third Br. at 13-14 (arguing that Defendants' "sale of *genuine* 3M products without more . . . does not violate [the Lanham Act]" (emphasis added)). Because nothing in the record indicates that the flagged masks were genuine, Defendants' arguments regarding the first sale doctrine are unpersuasive.  *See Abbott Lab'ys v. Adelphia Supply USA*, No. 15-CV-05826, 2015 WL 10906060, at *5 (E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Lab'ys v. H&H Wholesale Servs., Inc.*, 670 F. App'x 6 (2d Cir. 2016).

[10] As noted above, because this case involves counterfeit goods, the Court need not conduct a full analysis of the *Polaroid* factors to determine whether 3M has demonstrated a likelihood of confusion.  *See Spin Master Ltd.*, 325 F. Supp. 3d at 421-22.  However, even under a *Polaroid* analysis, 3M would prevail in establishing consumer confusion based on the "national and international recognition" of the 3M Marks, in addition to Defendants' "deliberate use of identical marks to sell products that appear [to have been] purposefully designed to be indistinguishable from" 3M's products.  *See id.* at *422*; *see also Performance Supply*, 458 F. Supp. 3d at 193 (conducting full *Polaroid* analysis in an analogous case involving counterfeit 3M-branded masks and concluding that the *Polaroid* factors favored 3M).

context – a presumption of irreparable harm can arise from the fact of *trademark* infringement. *See U.S. Polo Ass'n, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013) ("We need not here decide whether a presumption of irreparable harm from trademark infringement can apply in light of *eBay*."); *see also Algood Casters Ltd. v. Caster Concepts, Inc.*, No. 20-CV-04623, 2020 WL 5274172, at *2 (S.D.N.Y. Sept. 4, 2020).[11]  Some courts in this Circuit, however, have applied the *eBay* standard to trademark cases.  *See, e.g.*, *Juicy Couture, Inc.*, 930 F. Supp. 2d at 503 (explaining that, under *eBay*, "irreparable harm may not be presumed upon a showing of likelihood of success on the merits" but noting that "a party's demonstration of a likelihood of success on an infringement claim often foretells a finding of irreparable harm").[12]

The Court here need not decide whether irreparable harm may be presumed in the trademark context because, whether or not such a presumption applies here, 3M has presented sufficient evidence to support an independent finding of irreparable harm.  *See New York City Triathlon*, 704 F. Supp. 2d at 343 (proceeding in the same fashion).

Accepting that the masks flagged as counterfeit were indeed counterfeit – which is, for the reasons set forth above, the only conclusion that the current factual record permits – 3M has made a "strong showing of irreparable harm."  *See A.H. ex rel.*, 985 F.3d at 176.  3M has

---

[11] In the *copyright infringement* context, the Second Circuit, post-*eBay*, has required a moving party to offer proof of irreparable harm and not simply rest on the fact of infringement.  *See Salinger*, 607 F.3d at 77, 79-80.

[12] Prior to the *eBay* decision, the Second Circuit had held that irreparable injury was presumed once a trademark owner demonstrated a likelihood of success on the merits of its trademark claim.  *See, e.g.*, *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("A plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury."); *see also Algood Casters*, 2020 WL 5274172, at *2 (describing the law in the Second Circuit before *eBay*).

established that the 3M Marks are recognized and well-known in households throughout the

United States, and that 3M has spent hundreds of millions of dollars in advertising, marketing,

and promoting its goods and services under the 3M Marks.  *See* First McCool Decl. ¶ 5.

Defendants' conduct – the marketing, offering for sale, and sale of counterfeit 3M-branded

masks – imperils 3M's well-established brand and reputation in at least two respects.

First, 3M cannot control whether the counterfeit products that Defendants have sold or

offered for sale adhere to 3M's rigorous quality-control standards.  *See id.* ¶¶ 7, 28; *see also*

*Performance Supply*, 458 F. Supp. 3d at 192 (finding the same variety of irreparable harm with

respect to other counterfeit 3M-branded products).  This loss of control over the quality of

products bearing the 3M Marks constitutes textbook irreparable harm.  *See Mister Softee, Inc. v.*

*Tsirkos*, No. 14-CV-01975, 2015 WL 7458619, *5 (S.D.N.Y. Nov. 23, 2015) (finding irreparable

harm because "Plaintiffs ha[d] no actual control over the quality of Defendant's products or

services").

Second – and relatedly – Defendants' conduct threatens 3M with a loss of goodwill and

control over its reputation.  Over the past century, 3M's products have become the subject of

"widespread, unsolicited media coverage and critical acclaim," and, since the start of the

COVID-19 pandemic, the public has become familiar with 3M as a leading manufacturer of N95

masks.  First McCool Decl. ¶¶ 6-7.  3M stands to lose that goodwill should the public purchase

3M-branded products from Defendants that, because they are not in fact real 3M products, "do

not come with 3M's efficacy guarantees," *see* Jacobson Decl. ¶ 6, or – worse – are, for reasons

beyond 3M's control, less effective than genuine 3M products.  3M's prospective loss of

goodwill and control over its reputation constitutes a second form of irreparable harm.  *See New*

*York City Triathlon*, 704 F. Supp. 2d at 325 ("It is well-settled that a trademark owner's loss of

goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard."); *see also Performance Supply*, 458 F. Supp. 3d at 192 (finding that, in the absence of an injunction, 3M would suffer irreparable harm if "its carefully curated brand and reputation [were] left to the devices of Defendant's scheme to profit from a pandemic").

Defendants argue that these harms are insufficient to warrant injunctive relief because Defendants recalled certain products deemed potentially counterfeit, "sequestered" the masks that were flagged as counterfeit, agreed not to sell those masks, agreed to have those masks tested, and have not since sold any of the flagged masks. *See* Defs.' Third Br. at 15-16; Defs.' Second Br. at 4-5.

These arguments miss the mark because nothing in the record indicates that Defendants, absent an injunction, will not sell counterfeit versions of 3M's products in the future. *See Sream, Inc. v. Raj*, No. 18-CV-02534, 2019 WL 3716540, at *5 (E.D. Cal. Aug. 7, 2019) (finding that plaintiff "ha[d] shown irreparable harm because there [wa]s no reason to conclude that defendant w[ould] not infringe plaintiff's trademarks in the future given his established sale of a product bearing plaintiffs' trademark"), *report and recommendation adopted*, 2019 WL 5091138 (E.D. Cal. Sept. 4, 2019); *Coach, Inc. v. Allen*, No. 11-CV-03590, 2012 WL 2952890, at *11 (S.D.N.Y. July 19, 2012) (explaining that injunctive relief may be proper "even if there is no evidence that a Defendant is currently engaging in illegal sales"); *see also Museum of Mod. Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 372 (S.D.N.Y. 2018) (explaining that the voluntary cessation of misconduct can obviate the need for injunctive relief where: "(1) there is *no reasonable expectation that the alleged violation will recur* and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," but that a promise by

a party to discontinue past or ongoing misconduct is not sufficient (emphasis added) (quoting *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002))).

A promise not to sell counterfeit versions of 3M's products in the future, *see* Defs.' Third Br. at 15 (referencing Defendants' agreement not to sell the masks flagged counterfeit), does not mitigate this risk, particularly where Defendants continue to dispute that any of the masks it has sold or offered for sale were, in fact, counterfeit. *See Museum of Mod. Art*, 339 F. Supp. 3d at 372 ("[A] bare promise by a party in the course of litigation to discontinue past or ongoing misconduct does not justify denial of injunctive relief, since such unilateral action hardly suffices to ensure that the party will not, in the future, reverse course and resume its challenged activities." (quotation marks omitted)); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01-CV-11295, 2003 WL 21056809, at *6 (S.D.N.Y. May 8, 2003) ("A defendant['s] promise to stop selling the offending products, while perhaps a nice gesture, does not prevent a federal district court from ordering it to act pursuant to a party's request for injunctive relief.").

The Court finds that 3M has made a strong showing of irreparable harm absent injunctive relief.

3M has satisfied the second requirement for a preliminary injunction.

### iii.     The Balance of the Equities Supports a Preliminary Injunction

The balance of the equities tips in 3M's favor.  As explained above in the Court's irreparable harm analysis, 3M would suffer substantial hardship in the form of loss of control over the quality of products bearing the 3M Marks and loss of goodwill and control over its reputation in the absence of injunctive relief.  Moreover, Defendants' conduct has already required 3M to investigate over 200 reports from CovCare purchasers.  *See* Jacobson Decl. ¶ 7. And, 3M receives reports of potentially counterfeit masks purchased from CovCare "on a near-daily basis."  *Id.* ¶ 4.

Defendants do not dispute that 3M would suffer hardship should Defendants go on to sell counterfeit 3M-branded mask products – and for good reason, as such an argument would lack merit. *See WpIX, Inc. v. lvl, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("[I]t is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing products." (quotation marks omitted)). Instead, Defendants argue that, if the Court grants 3M's request to enjoin Defendants from selling *any* 3M-branded mask products (including genuine 3M products, that is), Defendants would lose out on "legitimate revenue" and suffer harm to their business. *See* Defs.' Third Br. at 17.

Undoubtedly, if Defendants were in possession of legitimate 3M mask products, an order barring them from selling those products would subject them to some hardship. However, such hardship would not outweigh the grave harm posed to 3M's reputation and brand in the absence of an injunction. Moreover, Defendants have adduced *no* evidence demonstrating that they are, in fact, in possession of a significant number of genuine 3M mask products. They have, at most, shown that they are in possession of "467 boxes of various 3M products that *have not been flagged as suspicious* by Customs and Border Protection," Third Arroyo Decl. ¶ 5 (emphasis added), and that they are in possession of 2,400 masks that were either deemed "legitimate" by 3M, *see* First Arroyo Decl. ¶ 7, or at least "not marked with red tape," as a result of the March 24, 2021 inspection, *see* Second Arroyo Decl. ¶ 5. As to the 467 boxes, Defendants have merely shown that the products contained in those boxes were not flagged as suspicious, not that those products are genuine 3M products or even that they are mask products. As for the 2,400 masks not marked with red tape, even if Defendants are in possession of 2,400 legitimate 3M masks – which 3M contests, *see* Tr. at 22-23 (counsel for 3M acknowledging 3M's position that it could not make a "conclusive determination" with respect to the 2,400 masks) – that figure pales in

comparison to the approximately 84,000 masks recently in Defendants' possession that 3M, according to sworn testimony, deemed counterfeit.  Thus, the record does not permit a finding that Defendants face significant hardship in the face of an injunction as compared to that posed to 3M absent an injunction.

The Court finds that the balance of equities tips in 3M's favor and 3M has thus satisfied the third requirement for a preliminary injunction.

### iv.       A Preliminary Injunction Would Serve the Public Interest

"The consuming public has a protectable interest in being free from confusion, deception and mistake," *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541, and "the public has an interest in . . . being assured that the mark it associates with a product is not attached to goods of unknown origin and quality," *New York City Triathlon*, 704 F. Supp. 2d at 344; *see also John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 637 (S.D.N.Y. 2018) (explaining that an injunction "[does] not disserve the public interest" where it "would prevent the proliferation of counterfeit works").

Here, an injunction would serve the public interest because, in the absence of injunctive relief, the public is at risk of being confused and/or deceived about the source and quality of 3M-branded products sold by Defendants.  *See Performance Supply*, 458 F. Supp. 3d at 198 ("[U]nless this Court enjoins Defendant's unlawful conduct, the public will continue suffering harm in the form of confusion and deception about the source and quality of the purported 3M-brand N95 respirators that Defendant is offering to sell for exorbitantly high prices.").  That risk is particularly acute in the context of the COVID-19 pandemic, as consumers make frequent and sometimes rapid decisions in trying to protect themselves and others against a deadly virus.  *See id.*

31

Indeed, the record reflects that a hospital purchased some of the counterfeit masks sold

by Defendants.  As stated in another decision concerning counterfeit 3M masks, "the protection

of healthcare professionals who are putting their lives on the line in the fight against COVID 19

is in the public interest.  Those brave and selfless professionals deserve trustworthy supply lines

of authentic PPE, including N95 respirators, that are free of misrepresentations [and] false

designations of origin . . . ."  *Id.*

This Court agrees and finds that an injunction would serve the public interest here, too.

3M has satisfied the fourth requirement for a preliminary injunction.

## II.     Scope of Relief

3M seeks a preliminary injunction that, like the TRO in this case, bars Defendants from:

- Selling or offering for sale any 3M-brand N95 respirator products;

- Using the 3M Marks in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any purported 3M-brand N95 respirator products;

- Falsely representing themselves as being a distributor, authorized retailer, and/or licensee of 3M and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection to 3M and its products; and

- Offering to sell any of 3M's products at a price and/or in a manner that would constitute a violation of New York General Business Law § 369-R.

3M's Second Br. at 17, 20-21.

The Court concludes that 3M is entitled to some, but not all, of the requested relief.

First, 3M is entitled to an injunction barring Defendants from selling or offering for sale

any 3M-brand N95 respirator products and from using the 3M Marks in connection with the

manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any purported

3M-brand N95 respirator products.  Defendants strongly object to these provisions, arguing them

to be impermissibly broad because they would bar Defendants from selling not just counterfeit

3M-branded products but also lawfully obtained, genuine 3M products. *See* Defs.' Fourth Br. at 2-3 (arguing that there is "no reason why CovCare should be forced to hold and/or destroy product that has either been passed by CBP or that which is not deemed to be suspicious, or even that which has been purchased from an authorized 3M reseller").

Defendants are correct that the requested injunction would bar them from selling even genuine 3M products. However, as the Second Circuit has remarked in the trademark context, a district court "must be permitted to fashion an 'injunction which will keep a proven infringer safely away from the perimeter of future infringement.'" *See Versace v. Versace*, 213 F. App'x 34, 36 (2d Cir. 2007) (quoting *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir. 2003), *abrogated on other grounds by 4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202 (2d Cir. 2019)). Such an injunction may permissibly prohibit otherwise lawful conduct. *See Johnson & Johnson v. Advanced Inventory Mgmt., Inc.*, No. 20-CV-03471, 2020 WL 6119516, at *13 (N.D. Ill. Oct. 16, 2020) (recognizing that a "district court may even enjoin certain otherwise lawful conduct when the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment" (quotation marks omitted)); *see also Versace*, 213 F. App'x at 36 ("[A] party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party." (quoting *Oral-B Labs., Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 24 (2d Cir. 1987), *abrogated on other grounds by Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577 (2d Cir. 1993))). In keeping with these principles, courts have repeatedly, in analogous counterfeiting cases, rejected the argument that an injunction sweeps too broadly because it bars the enjoined party from selling genuine versions of the goods previously counterfeited. *See, e.g.*, *Fendi Adele S.R.L.*, 696 F. Supp. 2d at 392 ("Filene's argument that the injunctive relief sought

33

by Plaintiffs is not narrowly tailored is unpersuasive . . . ."); *Advanced Inventory Mgmt.,* 2020 WL 6119516, at *13 (rejecting defendants' argument that an injunction "would impose a massive hardship on their business" by prohibiting them "from selling genuine . . . medical devices during the pendency of [a] lawsuit," in part because it appeared that defendants "knowingly caused thousands of counterfeit and contaminated devices to enter the market").

3M has submitted uncontradicted evidence that Defendants, on at least five occasions, sold counterfeit masks to a variety of customers.  3M has submitted additional uncontradicted evidence that Defendants were, at one time, in possession of tens of thousands of counterfeit masks at their New Jersey warehouse.  Defendants' conduct indicates that an injunction permitting them to sell any 3M-branded mask products would not sufficiently protect 3M against future encroachments on its rights.  Indeed, it seems that Defendants' core motivation for fighting the requested injunction is their desire to sell additional 3M-branded products, some of which may turn out to be counterfeit themselves.  *See* Third Arroyo Decl. ¶ 5 (referencing "467 boxes of various 3M products that have not been flagged as suspicious by Customs and Border Protection"); Second Arroyo Decl. ¶ 5 (stating that 2,400 masks were "not marked with red tape" as a result of the March 24, 2021 inspection); Defs.' Third Br. at 4-5 (acknowledging 3M's position that 3M was unable to determine conclusively whether certain masks that remain in Defendants' possession were counterfeit).

Accordingly, 3M is entitled to an injunction barring Defendants from selling or offering for sale any 3M-brand N95 respirator products and from using the 3M Marks in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any

purported 3M-brand N95 respirator products.[13]

Second, 3M is entitled to an injunction barring Defendants from falsely representing themselves as being a distributor, authorized retailer, and/or licensee of 3M and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection to 3M and its products.  Just as the record reflects that Defendants have been in possession of, marketed, and sold counterfeit masks, the record also reflects that Defendants have attempted to portray themselves as authorized 3M distributors.  Specifically, 3M has adduced documentary evidence reflecting that an apparent CovCare employee messaged an account supposedly belonging to the broker involved in the Ottawa Hospital sale, assuring the broker that CovCare is a "trusted and reliable Distributor."  *See* ECF No. 8-18 at 1; First McCool Decl. ¶ 24.  Although Defendants characterize 3M's assertions regarding this evidence as "quite the allegation on information and belief," *see* Defs.' Third Br. at 11, they offer no evidence (whether sworn declarations or documentary evidence) to contradict 3M's submissions on this point.  Regardless, 3M has also submitted evidence that CovCare supplied a customer with a fake "3M acknowledgement agreement" stating that CovCare qualified as "an authorized agent to procure product for the company."  *See* First McCool Decl. ¶ 19; ECF No. 8-13 at 5.  Defendants do not address this evidence even in briefing, let alone with contradictory evidence.  The record indicates that an injunction is needed to keep Defendants from representing themselves as being

---

[13] Defendants argue that the requested injunctive relief runs afoul of the first sale doctrine because it would bar them from selling goods that might otherwise fall under the doctrine's protection.  *See* Defs.' Third Br. at 8-9.  But, even if the Court were to accept that Defendants are in possession of 3M products to which the first sale doctrine might apply – which is not a given fact based on the current record – the Court nevertheless has the power "to fashion an 'injunction which will keep a proven infringer safely away from the perimeter of future infringement.'"  *See Versace*, 213 F. App'x at 36 (quoting *Patsy's Brand, Inc.*, 317 F.3d at 220).

a distributor, authorized retailer, and/or licensee of 3M and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection to 3M and its products.

Third, the record as it currently stands does *not* support an injunction barring Defendants from offering to sell any of 3M's products at a price and/or in a manner that would constitute a violation of New York General Business Law § 369-R.  3M has submitted only limited evidence concerning the prices that Defendants charged for certain 3M-branded masks, *see* ECF No. 8-16 at 1 (image of CovCare receipt showing that a pack of five "3M 1860 N95 Facemasks" was purchased for $39.99), and made (unsworn) assertions in its briefing as to standard prices charged by 3M, *see* Motion at 7, 20 ("Defendants . . . have offered to sell thousands of 3M-brand N95 respirators at grossly inflated prices – for example, $74.99 for 10 respirators – which is approximately 500% above 3M's actual list price.").  3M has not carried its burden for obtaining preliminary injunctive relief on this issue.

Finally, for the reasons set forth in the TRO, 3M shall not be required to post a bond.  *See* ECF No. 24 at 5.

## III.   Defendants' Requests Regarding 21-MJ-00465 (E.D.N.Y.)

In their most recent brief, Defendants request that the Court unseal case 21-MJ-00465 (E.D.N.Y.), which, according to Defendants' submissions, is the case in which the goods previously in Defendants' possession were seized.  *See* Defs.' Fourth Br. at 6; Second Garson Decl. ¶ 7.  Defendants also request that this Court "order that such goods be preserved until further order of this Court."  *See* Defs.' Fourth Br. at 7.

The Court denies these requests without prejudice to Defendants renewing these requests before the Magistrate Judge assigned to 21-MJ-00465 (E.D.N.Y.).

In ruling on the instant Motion, the Court has not considered any sealed materials relating to case 21-MJ-00465 (E.D.N.Y.).

## CONCLUSION

For the reasons set forth above, Plaintiff 3M's Motion is GRANTED IN PART and DENIED IN PART, and IT IS ORDERED THAT:

Defendants, their agents, employees, officers, and all persons and entities in active concert and participation with them are, pursuant to Federal Rule of Civil Procedure 65(a), hereby preliminarily enjoined, during the pendency of this action, from:

1.  Selling or offering for sale any 3M-brand N95 respirator products;

2.  Using the 3M Marks in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any purported 3M-brand N95 respirator products; and

3.  Falsely representing themselves as being a distributor, authorized retailer, and/or licensee of 3M and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection to 3M and its products.

SO ORDERED.

_/s/ Diane Gujarati_____
DIANE GUJARATI
United States District Judge

Dated: May 5, 2021
        Brooklyn, New York